Good morning. I'm Karen Landau, and I represent Araceli Mendoza. I'd like to reserve two minutes for rebuttal, and I'll watch my clock. How long for rebuttal? Two. Okay. Sorry, let me – there we go. Tall to short. I know. Well, I have that challenge myself, so. I'm going to try to address three – optimistically, I'm going to try to address three arguments. First, the evidentiary arguments that are presented in the brief, the prosecutorial misconduct, and then the question of how a duress defense should be construed for purposes of the TVPA. Before I start, I'd like to say that this is a very close case. The jury obviously accepted Ms. Mendoza's duress defense, at least in part. They acquitted her of one count. They hung on another, and they convicted her of one trafficking count and the conspiracy. Were you trial counsel? I was not. I was not. I'm not a trial lawyer, Your Honor. Okay. You wouldn't want to see me in a trial. But – Well, I'm not going to make that judgment. Well, we won't go there. Yeah. Yeah. But I think that, you know, this was a close case, and that informs all of the arguments that are presented. So, the count that Ms. Mendoza was convicted of, the substantive count, was the trafficking of BM – I'm just going to use her initials – and she was the first to join the group aside from Ms. Mendoza. The reason that, part of the reason that evidentiary issues are so important is that the, you know, Ms. Mendoza was not allowed to testify in her own defense about her belief that Wizar, the main perpetrator, the only perpetrator, was a gang member, that she believed and why she believed that, and particularly the gang that he was a member of. That – Well, now, the court – is that accurate? The court limited – The court limited it. But my under – review of the record reflects that the jury did know that he was associated with a gang, and there was evidence before that. That's correct, but she was limited in her belief, and she does have a Sixth Amendment right. But let me go on. The other part that was critical was that the court allowed the case agent to testify that, based on her investigation, he wasn't in good standing, and he really, you know, he was really kind of on the outs. He was in bad standing, which in gang terms means, you know, you're not, you can't associate, you can't call first, you know, you might even have a green light put on you. So, when you put those two together, the government was able to undermine the issue that, you know, the point that she legitimately feared because of her knowledge of the dangers that gang members presented. But to be specific and to follow up on Judge Callahan's point, as I read the record, she was allowed to testify as to her subjective belief as to whether he was a gang member, you know, and that he wore the color red frequently, but she was not allowed to testify objectively that he was. Or his, and that seems to raise it open for the prosecution to be able to rebut and say actually he was not a gang member in good standing. So, why was that an abusive discretion? It was an abusive discretion because, well, first of all, because what was relevant, first of all, I do think she was unduly limited, and I don't want to spend too much time on this point, but I do think she was unduly limited. Well, it's good to spend time on the points the Court's asking you about. That's your right. Your point, Your Honor. My apologies. My point. We are relevant to this. Yeah, you are relevant, very relevant. So I guess my reading is different. She wasn't allowed to testify about her belief, and where the Court limited it, that wasn't. You're right, though, that objective factors supporting gang membership came in, largely, a lot of it through the government's own presentation of the photographs of him, et cetera. But the problem is that there was no linkage between her belief and her understanding. There was nothing to show that she knew anything about that he was in bad standing, or even how she could have known that. Because, you know, they were off in their own, you know, little world, and there was no, there were other men coming and going, but there was no showing of a link that she knew anything about gang procedure or— But just going back a step, she did testify that he was gang-affiliated and that all he had to do was make a call. She did. That's what she said, yes. That was her, yeah. That's, that was her, that went to her belief. That's what she did. Why wasn't that sufficient, and why doesn't it then turn to the discretion of the trial court under 403 as to whether more is needed in terms of issues of foundation? First of all, we have a Sixth Amendment right here to testify in our own defense, and so it's a constitutional analysis. And the court cut her off at a point where she was trying to testify about her understanding of the, the, the B. Well, I don't quite understand what you're saying. Her right, she testified, but she has a right not to testify. But I don't understand what you're saying here. She testified, right? She did testify. So, once you get up there, that's, and I was a trial lawyer for a very long time and a But, I mean, this whole, this whole thing, if these jurors, people can't really imagine what this whole world is. And so they're taken into the, essentially into the underbelly of a world where you've got trafficking, you've got, you've got prostitution, you've got, you've got gang issues, and they're asked to, to make these decisions. You're right, they deliberated, I think, like eight days or something. They had some questions. She wasn't convicted of everything, but there was, but there was testimony to the jurors about how this world worked, you know, and she was able to testify that she, she was allowed to put a duress defense on, albeit limited from your perspective. But I'm, I'm just trying to figure out what is it that the jury really didn't know here? So, I think my point is, and what, what I'm trying to make, what perhaps I'm doing in a very inartful way, is that there were errors in, and I, I talked about the gang one, but there's also, there are also errors in allowing Contreras to testify about accepting responsibility for her, her behavior and that, you know, her situation didn't excuse her behavior, that sort of thing. Those, these, the case was close enough that small, the errors that wouldn't otherwise have mattered, mattered here, and I guess that's my point. Well, okay, but if we're talking about errors, are most of these, the limitations are decided under abuse of discretion? That's correct. Trial judges have a pretty wide latitude. If there are good reasons to limit it and there are other reasons that you don't want it limited, it's, we don't get to say, I don't get to say, what would Judge Callahan have done if I had been the trial judge? And maybe, you know, sometimes abuse of discretion can be upheld with either way, because it's left to the person on the ground. But it's, it's not, it is and it isn't, it is, when the case is closer, you're more likely to find an abuse of discretion, and I would cite Waters for that, for that point, U.S. v. Waters. With respect to the Contreras testimony, the, the co-defendant's testimony to which you have credibility, why wasn't it an appropriate question to ask her how she felt about her conduct? Well, it would have been one thing if, if that was all, but that's not all. You know, she was asked, I mean, first of all, the, yes, you, you, they were entitled to rehabilitate her, they could have said, you agreed to testify truthfully, et cetera, those things. But I don't think, but, but to, to draw out testimony that being a pregnant teenager didn't excuse your conduct, that really crossed the line. That was not relevant, that was, it was, it was unduly prejudicial. And of course, it was directly, it, it was set up as a direct comparison to Ms. Waters' testimony. But who started it? The cross-examination started it, and then rehabilitation happens. You know, it's, it's, it's kind of like a lot of times people want to bring in a good act, and then they're upset when they open Pandora's box and all the bad acts come in. But, Your Honor, the cross-examination doesn't, didn't open the door to that. I mean, it was, it's one thing, you cross-examine people on the facts, you cross-examine people on the truthfulness, but that doesn't open the door to every, everything. And there was an objection, it was preserved. I would really like to talk about the, the jury instruction and the vouching briefly, because I'm really running out of time. So, normally, on plain error, it's very difficult. The Court is not usually particularly open to plain error arguments. Okay. So, tell us what the vouching is that you're talking about. I'm talking about the vouching at, it's at, it's where the prosecution elicited testimony from the case agent. We don't prosecute, to these, to this effect, we don't prosecute prostitutes or minors. We prosecute traffickers. Okay. So, that was the first part. Then, it went on where the prosecutor asked the agent, did you, you know, did you, you know, you investigated it and you determined that we should have a prosecution. Yes. But you didn't make the decision to prosecute. No. I, who made the decision? You made the decision to prosecute. So, the prosecutor placed her personal credibility behind the case itself. And that was not invited. Okay. But didn't you call into, when I say you, that your client called into issue about, your client's defense was, I am a victim of trafficking myself and I was under duress and therefore, I cannot be guilty of conspiracy. So, if, if you already, you open that can, that can of whatever we want to call it, or open Pandora's box, then the theory of not being just a mere prostitute are not the people they're going after because you have the whole theory of the bottoms and, and all of that. It just seems like if you, if that's the defense you want to put on, then the prosecutor's in a position of explaining why this, why being a victim doesn't, the fact that you've been a victim at some point doesn't exempt you from conviction. Well, of course. But that doesn't allow the prosecutor to commit misconduct and vouch for their case. There's a difference between saying we, and they did, they presented a lot of evidence that, that the, my client wasn't a victim and, and why they didn't believe that she was a, you know, or why, you know, they countered with a lot of evidence. They presented text messages. They presented all kinds of evidence. That was all legitimate. They cross-examined my client. Allowed to do that, no problem. But what the prosecutor isn't allowed to do is to commit misconduct and say, I chose to prosecute this case. I stand behind it. I mean, I'm paraphrasing. Obviously, she didn't say those words. Did, did the prosecutor ever say, I believe this witness, I believe that one, or? No, she didn't, but she did it, she did it in, effectively through the case agent. Well, but the case agent was explaining how, what, how you can be, theoretically, to people that know nothing about trafficking, how all of these, all of these witnesses, at some point, probably were victims of trafficking. That's how they got into it. They were prostitutes. But that that isn't, that doesn't, therein, make you a trafficker. And they're saying, your decision as a jury, is this person a trafficker? Is this person participating in a conspiracy? And you got to explain what the elements are. But that's, that ignores, that disregards her entire testimony. It started out as testimony about why they didn't prosecute minors. And the, and the, the district, and the, and the case agent explained, we don't prosecute minors. Minors can't do all these things. And then, she went into this whole thing about how we prosecute traffickers, and then went on from there about who made the decision to prosecute. She made, the prosecutor made herself a witness. Well, let me ask about the prejudice side of this. This was, I guess the, the, there were many witnesses here. I think the government put on ten witnesses, a defense called seven. This was, this, if you want to call it vouching, the vouching happened over a small couple of lines of, of the record. You have evidence of, of Ms. Mendoza booking hotel rooms, you know, advertising for this, arranging for, for these meetups. Her proffer statements come in. Why, why should we consider this to have to, to satisfy prejudice under a plain error review standard? Because, as I said, it was a very close case. The jury there was evidence that Ms. Mendoza was under duress very shortly, if not at the very beginning, very shortly after the beginning. And the, the, the length, I mean, I can't emphasize enough, there were eight days of jury deliberations for a nine day trial. That's pretty unusual. The jury had questions. There was, I mean, this is the type of thing that, this was a particularly egregious form of vouching. If, I'm almost out of time. Um, I'm going to devote one, one minute to my jury instruction argument and then I'll. Well, you don't even have one minute left. How about if I give you two minutes for rebuttal and you can listen to what the, the government says and I'll give you two minutes on rebuttal and then if you want to still cover that, you can. Okay. Thank you, Your Honor. Good morning. Good morning. May it please the court, Annie Schaefer of the United States. This court should affirm for three reasons. The district court's evidentiary ruling is for well within its discretion under Rule 403. The district court's instruction on duress was correct as a matter of law and was supported by the evidence and there was no improper control or misconduct rising to the level of plain error. Since we left off on the vouching, why don't you jump into that and talk about the, the voucher. You were trial counsel, is that correct? Yes, Your Honor. So why don't you respond to the vouching that you have been accused of? Yes, Your Honor. So there were two, uh, two lines of questioning that were challenged here. Um, as my friend points out, both are responsive specifically to topics that were raised by defense in the cross examination. And so it begins with the defense's cross examination. And it starts for ER 766-67. If you look at the record, defense counsel asks Agent Trombetta a number of questions about the legality of prostitution, the application of criminal laws for juveniles versus, uh, adults, whether there is a Federal system of prosecuting juveniles. And he does this after eliciting from Agent Trombetta the fact that she is actually a licensed attorney, in addition to being an FBI agent, that she was a prior defender and a, uh, and a prior DA. And so he does this and he starts eliciting all these opinions about prosecution policies and laws. Um, so if you turn... So if you started on cross, you didn't go there first? Your Honor, the majority of Agent Trombetta's testimony during the government's, uh, case in chief, um, was to admit evidence, the substance of evidence that was obtained in this case. And so Agent Trombetta spent most of her time discussing her conduct of the investigation in this case and admitting all the different back page ads, the hotel records, the Instagram records, and so forth, which the government was, um, submitting as substance of evidence for guilt. Um... Well, counsel, let me ask this. I, I understand the defense may have opened the door to this, but at the same time, the questioning from the government elicited responses that you don't make the decision to prosecute the pro... The U.S. Attorney's Office does, you know, and we, and we traffic, traffickers, not prostitutes. Why isn't that vouching? Why, why isn't that putting the imprimatur of the, of the U.S. Attorney's Office through the mouth of the up on, on some of the cases that are deemed as vouching? Yes, Your Honor. I, I do want to say there's no direct case on point, first of all, when it comes to vouching, but there are some principles that are certainly relevant here. And so one, vouching typically occurs when a prosecutor is vouching for the credibility of a witness or the veracity of the evidence in the case. So if you look at cases like, um, Hermannick and Edwards, um, and these also invoke, uh, another rule called the witness advocate rule, in which the prosecutor injects him or herself into the case as a witness. Um, those are, those are cases in which ultimately the problem is you're inviting the jury to convict based off of something besides the evidence, the prestige of the government, for example. That's not what occurred here. And I think context ultimately matters and it matters for both the error portion and for determining prejudice. And so again, with regard to the, that quote I did when the prosecutor asked, you know, do you, do you charge cases? Who charges cases? The U.S. Attorney's offices, I did, right? Versus the investigator. The, that was a response first directly to 4 ER 796 to 98, in which defense counsel was soliciting from Agent Trombetta, essentially got from her that she made probable cause determinations in her search warrants that, um, two of the co-defendants, meaning Guizar-Cuellar and Ms. Contreras, were traffickers, and that, um, Mendoza and And so what the prosecutor was entitled to do in redirect was to provide clarifying information that regardless of these probable cause determinations and what investigators may determine in their search warrants, the charging decisions are a completely different entity. And that's, again, I do want to point out there were no objections raised at this time. The Court did not stop the prosecutor because in the context of trial, when this occurred in redirect, in direct response to what was happening in cross-examination, everyone in the courtroom understood that this was to answer or to provide clarifying information on that specific piece. I, I do see that red in a vacuum. Um, the, the phrasing here, the, the we prosecute traffickers and the, you know, I did, um, appears problematic, but that's why prosecutorial misconduct isn't red in a vacuum. That's why we look at context. And, um, the Ninth Circuit, I think it's, uh, United States versus, I can't pronounce the name correctly, but Nicosia, there's a number of factors in which the Court considers to determine whether or not vouching ultimately arises through reversible conduct. And again, it's a multi-factor test, but you look at the form of vouching, the timing of it, um, and so forth. And when you look at those factors here, again, as you point out, Judge Sanchez, this occurred in the middle of trial. Um, Agent Trombetta was one of 10 government witnesses, 17 overall witnesses. She was one of probably eight law enforcement witnesses. Um, she actually testified both in the government's case-in-chief and its rebuttal, um, case. And most of her case were — was about emitting, um, a lot of the substantive evidence in this case. And what about Ms. Landau's argument that this was a close one? There were many, many days of jury deliberation, and, and so the, you know, hung jury on one, acquittal on another count. Does that tip us closer if there was vouching toward a finding of, uh, prejudice or substantial violation of rights under a plain error review? Well, First Your Honor, I, I do disagree with the characterization that this was a close case. I think it's dangerous to speculate based off of a jury's verdict or trying to get into its deliberations why it reached a certain verdict. To determine whether or not a case is close, we look at the evidence. We look at what was presented to the jury. And if we look at the case here, we have, again, the records replete, uh, with documentary evidence of both Mendoza's case. And I do want to point that there were hundreds of pages of Ms. Mendoza's Instagram records, her communications with her co-defendants, which were contemporaneous evidence of her conduct and her willing participation in this conspiracy throughout that entire conspiracy period. The jury had that, and it had also a very fulsome case presented by Ms. Mendoza as to the abuse that she suffered and the trauma that she suffered starting from when she was a child. Um, it looked at all of this, and it was, it was entitled to weigh all its evidence. And based off of the evidence, it found that both the government had proven guilt beyond a reasonable doubt, and that Ms. Mendoza had not met her duress offense by a plaintiff. But she was allowed to put a duress offense on, but there were some limitations. Can you explain, um, and, and I didn't quite, I, so is there a Fifth Amendment issue here? Because she chose to testify. I didn't quite understand that. Uh, yeah, I recognize she has a Fifth Amendment right not to testify, but she did. Yes, Your Honor. So, um, absolutely. So can you respond to that? Yes. Defendants have a Sixth Amendment right to testify. It is not absolute. Uh, this Court has said time and again, and I think there's a case, it's actually a duress case here, uh, United States v. Moreno. This is 102 F. 3rd. 994. It says the constitutional right to testify is not absolute. Without question, the government has a legitimate interest in excluding evidence which is not relevant or is confusing under Rules 402 or 403. That's what the district court did here, was with regards to, um, the gang affiliation evidence, for example. The government was trying to preclude this evidence because it was trying to avoid the 403 problem of inviting a mini-trial on a subsidiary issue that ultimately was quite complicated. Um, once Ms. Mendoza opened that door, and she certainly did so, um, both during the defense's cross-examination of the government's witnesses as well as during her own testimony, the government was entitled to provide, uh, information to rebut that. And the— So when you say that the mini-trial would have been on whether he is actually a gang member, is that what you're saying? Yes, Your Honor. Because for—for Ms. Mendoza's subjective belief in Mr. Guisar's gang membership to be relevant, the direct—it has to be relevant to the elements of the direct offense. So it has to support two of the factors, which is whether she had a well-grounded fear that—of an immediate threat of death or bodily harm, and second, whether she had any reasonable opportunity to—to escape. So certainly, to some extent, her subjective beliefs that Mr. Guisar Quiller was in a gang and therefore, in her own words, could just make a call and have her killed would only be relevant if Mr. Guisar Quiller was, in fact, in a gang and could do that. And so once she opened the door to that, the government was entitled to present a rather complicated picture. And I don't know if the evidence, you know, really supported or helped either party in this case. Well, once—once the government presented the—the government was permitted to present evidence as to there was—he was no longer an active gang member. Yes, Your Honor. If that's an issue, then why was it appropriate to limit the—the defendant's testimony on that to a very focused area? Why—why wasn't she permitted to give more of her views? Your Honor, first of all, there has been—there was no proffer in this case, and the government's not clear what more Ms. Mendoza would have testified to. The facts that she testified to were already before the jury, which was how long she had known Mr. Guisar Quiller, seeing him every single day, the clothes that he wore, the fact that he wore a hat with the letter B on it, the fact that she was raised being familiar with Norteños and they always wore red. Again, the testimony that she wanted to get in that supported her belief in—in Mr. Guisar's gang membership were all before the jury. In other words, she wanted to testify and was—stopped from testifying that he was a gang member, but when the government rebutted it with—with the agent's testimony, I guess it was established that he was a gang member, but just not one in good standing any longer. By the time the agent testified as far as the gang membership, Your Honor, it was in the government's rebuttal case. And the court actually gave the defense a chance to put on a surrebuttal case, which was very uncommon. The defense did not. So the defense could have put Ms. Mendoza back on the stand if it wanted to and made the argument that we want to put more evidence as far as gang membership, but it did not do so here. The limitations occurred at the very beginning, and they were during Ms. Mendoza's—not even during Ms. Mendoza's testimony, sorry. They were—actually, I'm sorry. They were during Ms. Mendoza's testimony, and then later on during her cross-examination, she actually offered more information. She made the exact statement, he was in a gang. He could have made a call at any time. So, stepping back, it seems to me that the trial court gave a great deal of leeway to the defense to put on this duress defense, including her own experience having been a victim and been brought into this life, and not only the physical violence that she suffered, but also other forms, of course, of conduct by—I'm forgetting his name now—Grizar Cuellar. What do you make of—and I'm anticipating Ms. Mendoza's arguments—but what do you make of the argument that the jury instruction should have reflected other forms of coercion beyond what the common law has identified? Well, Your Honor, I want to discuss it from, I guess, two different angles. First of all, when it comes to the instruction itself, this was correct as a matter of law, and so the policy arguments that Ms. Mendoza is making I will address shortly, but as far as the idea that she was limited in presenting evidence about the trauma she'd suffered, she was not. She was able to present a plethora of evidence with regard to the abuse that she experienced from Mr. Grizar Cuellar, as well as outside of the conspiracy. Maybe you can cover on the—there was a request for a different instruction. The instruction that was given, there were eight days of deliberation. There were jury questions about the instruction, and the court answered. So I think your friend on the other side is going to probably respond to that, so maybe give your perspective on that. Is that where you were going? Yes, and I would add this. The statute has two elements. There's two different crimes that can be committed under the statute, trafficking and minors and trafficking and non-minors. Yes, Your Honor. And the standards are different. Yes, Your Honor. If the—why wouldn't it be appropriate to consider the standards that apply to an adult who's being allegedly coerced into being trafficked in considering that adult and whether that adult was coerced under duress with respect to the trafficking of minors? Well, Your Honor, I want to look at it from first the duress defense, which is a common law defense. It's been well-defined by this court to have rather strict elements and defines harm in a certain way. And then you have, of course, Section 1591. And so there is neither support from either the case law, you know, surrounding duress defense or the statute itself for the fact that we should conflate these two and essentially create or expand the duress defense for those who happen to have been also trafficked, which, again, was not one of the charges in this case. This was a—this was, again, a case in which the—Ms. Mendoza was charged with the sex trafficking of children, which does not even implicate that coercion definition, as the court has been alerted to. And so I think that the question of whether or not—why should we not use this coercion instruction, well, again, that's a policy argument, Your Honor, and it's just not supported by the law. And I think what the court did here when we're looking at instructions and we're looking at it for an abuse of discretion, the court was well, well within its discretion and did what was legally correct here, which is it used the Ninth Circuit instruction. And then it gave a modification to the defense. It actually added a line that said, in determining these elements, you can consider the defendant's circumstances, including—and it gave a number of factors. And so Judge Sanchez, when you were mentioning whether or not she could present, you know, all these other forms of harm, she certainly did. She was allowed to present that to the extent that it supported the elements of duress. And as I understand it, that additional instruction allowed the jury to consider these —this other evidence in terms of reasonable fear and the ability to escape those determinations of the instruction. Is that —is that your understanding? Yes, Your Honor. So then if we go to the question, there were questions, and the judge gave an answer, because the jury was struggling. You know, you could infer from the questions, they were struggling with duress. What happened there? I realize we're taking you over, but I know that that's going to be discussed, so. Yes, Your Honor. Thank you. So the question by the jury, again, was, if the defendant is under duress for only a portion of the time charged, is that sufficient for a defense, or must the defendant be under duress for the entire time being charged? The Court provided in the answer that if the crime charge involves a period of time, the defendant must prove she was under duress for the entire time period charged in that count. That explanation is consistent with this Court's case law on duress. You look at cases like Bracera and Janelle, which is what the district court cited, and those are cases that involve a conspiracy period. And the Court found that duress was not met, because during that entire conspiracy period, there were periods of inactivity, reasonable opportunities to escape, periods in which the defendant was not participating in the conspiracy, and so forth. And so from that, legally, this instruction, or this answer, was correct. Whether or not it was within its discretion to give one, I think Warren is helpful in this case, in determining when it's appropriate to answer a supplemental, you know, given a supplemental instruction on a question, or not. And I think the Court weighed those factors here. And one of the factors that you look at is whether or not the instructions that are already available do answer the question. Now, my friend says, yes, during that very lengthy duress instruction, there's this phrase that says, at the time that the crime is charged, the defendant must meet these three factors or elements. Again, though, it's not very clear that that actually answers the jury's question. And there was legally a clear answer to the jury's question. And so as a matter of discretion, what the Court did here was proper in that respect. And now I'm well over my time. We don't have any other questions. Okay. Thank you. Thank you. Thank you, Ms. Shea. All right. So, I'll give you three minutes. And you can see where we were focusing. So, that could take you into the instruction if you want. Actually, I would like to start with the instruction. So, I think that there's an analytical, there's a, so, in terms of whether the jury instruction on duress was correct, this is a novel issue. And it's, it may arise again in the context of the TVA. Well, the Ninth Circuit jury instruction, that was the one that was given. And you got some additions to it. So, what's wrong? Well, I got the Lopez instruction, so let me explain what's wrong. So, the District Court rejected the idea that the jury instruction should be parsed in connection with the statute. And actually, when we're talking about a common law defense, like duress, where the best, so Congress, so a common law defense is construed and interpreted in connection with the relevant statute at the time of enactment. I guess I'm confused. You're talking legalese. Okay. So, but, all right. If the judge had just given the Ninth Circuit instruction. We would have had a problem. That's no error. No, we would have had an error. Absolutely, we would have had an error. But the judge gave a slightly better instruction. And we do have an error. And the error is that the So, you asked for that addition. You got something. But then that made it worse? No, I'm not saying it made it worse, Your Honor. Okay. So, I just need to understand what the problem is. So, Your Honor, the problem is that the defense asked for an instruction that construed, that would have allowed the immediate harm required by duress to be construed in line with the Trafficking Victims Protection Act. And the act itself is the best evidence that Congress's intent, that Congress contemplated a broader duress defense. Because what we have is a modern statute. Do you have a case on this? Yes. Dixon v. United States. And I would quote, Dixon says, and this was in the context of the burden of proof, but nonetheless, assuming the defense of duress is available to the statutory crimes at issue, then we must determine what the defense would look like as Congress may have contemplated it. Now, this is a new crime. This is not a traditional common law crime. It is not a murder. It is not a robbery. It is, and the TVPA itself demonstrates that Congress had an intent of, and I'm going to run out of time, but Congress had an intent to protect women and children. And it also broadened the scope of prosecution of persons who engaged in trafficking. So this goes back to why, in the context of a prosecution of an adult who is arguably a victim herself, that we would use a broader definition of duress in drawing the scope of her defense. Are you wanting an instruction, if the defendant was a victim of abuse, the defendant cannot be convicted of conspiracy to traffic? Is that what you want? Oh, it wouldn't be that broad. But what it would have allowed, the requested instruction provided for a bigger, so the statute itself defines serious harm in a broader way than duress defines physical harm. Duress, as it's currently in the common law, requires an immediate threat, immediate physical harm or threat of physical harm. But the TVPA defines coercion and defines the harm in a much broader fashion. And what was requested was an instruction that tracked the statute. But so I guess I'm having a little bit of trouble understanding the argument that Congress would have intended to broaden the common law definition of duress to coincide with the statutory definition for sex trafficking. Because it seems that cross purposes, if Congress is expanding the statutory definition of sex trafficking to encompass more types of coercive behavior, why would it also want to expand the definition of duress beyond the common law to exclude from prosecution many more people? So for example, your definition was including, was proposing threats by psychological, financial or reputational harm. That's right, as provided in the statute. Right. Provided for the prosecution of sex trafficking. Yes. So tell me what is it within the statute or congressional intent that would suggest duress should be expanded at the same time? Well I think you have to look at, you look at the legislative history and which talks about that most of the victims are women and children. It also talks about there were other things enacted with, and again when it was revised significantly in 2008, the statute was expanded to provide that victims of serious trafficking shouldn't be prosecuted. Now that's, you know, the government was clearly within its rights to prosecute Ms. Mendoza. I'm not saying that. But she, but her defense was limited and the statute itself, I'm sorry did you, oh I'm sorry. If Congress intended by section 1591 to do what you're saying, why didn't it put that into the statute? Well they didn't have to, Your Honor, because under Dixon we look to the time of enactment to construe a common law defense. But this is a statutory defense. No it's not, it's not a statutory, it's a common law defense to a modern statute. So is there a case where a common law, the common law defense of duress was changed and modified based on the statute? Yes Your Honor. Well not on, not on the statute, but if you look at the, if you look at the duress cases like Bailey, for example in this. Which I understand about escape from prison, but I'm saying, but, but here you're making this novel argument that the statute or the statute itself should modify the duress defense and I'm asking if there's any case to support that. I can't cite a case, Your Honor. I, believe me, I went over Dixon before this argument. So what, and what about the argument that, that Judge Cronstadt raised that even if this word would apply in general to a duress defense, it wouldn't apply here because there were minor victims. And the statutory definition of the TVPA for duress and coercion does not apply to minor victims. That's true, but the stat, well that's not necessarily, I'm sorry, can you, the statutory defense does not? Well, in other words, the definitions for, if, as I understood it, the definitions for coercion or, in the TVPA is applied when the victim is an adult victim. That definition does not apply when it's a child. That's, that's correct. A minor, you could. And, and here we had minor victims, three minor victims. Right. So even, even if you were right, even if we agreed with you to a certain point, it wouldn't be applicable in this case because these were minor victims. But the critical point here is that the question is if, if my client is a, could be, could have been, if they could have charged Mr. Guizar, for example, with trafficking my client based on force, fear, coercion, then, I mean, that's, that's the, the, the, the point is that she qual, she arguably qualifies as a victim under the statute. The government could have prosecuted her trafficker for, based on her, had they chose to do so. They did not, that's fine. But the, the point is that, that she should have access to that same defense. Okay. Did, did you have any questions? All right. We've taken you way over. So thank you both for your argument in this matter. This case will stand submitted. Thank you, Ms. Shea. Thank you, Ms. Landau.
judges: CALLAHAN, SANCHEZ, Kronstadt